UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| WILLIE E. JACKSON, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:05-CV-907 (JCH) |
| ) | |
| METRO/BI-STATE DEVELOPMENT ) | |
| AGENCY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

The matter is before the Court on Defendant's Motion for Summary Judgment (Doc. No. 50), filed December 13, 2006. The matter is fully briefed and ready for disposition.

## BACKGROUND

Plaintiff, who is black, worked for Defendant[1] as a Senior Network Analyst until his termination on October 2, 2003. (Def.'s Memo. in Supp. of Mot. for Sum. J. ("Def.'s Memo"), Doc. No. 52 ¶ 6, citing Ex. 2 pg. 61, Ex. 7). His job responsibilities included project support for the Cyborg Project; answering help desk calls; backing up network data; administering network security; monitoring servers; troubleshooting hardware and software; and supporting the transit systems' applications. (Id. at Ex. 2, pg. 61). Plaintiff's immediate supervisor was Susan Brocco[2] ("Brocco"),

---

[1]Defendant is an interstate agency created pursuant to a compact between Missouri and Illinois. Its purpose is to coordinate regional planning and development in the Bi-State Metropolitan Development District. See Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp., 948 F.2d 1084, 1085 (8th Cir. 1991)(discussing Defendant).

[2]Brocco's name is now Susan Baker. (Def.'s Memo. Ex. 1).

1

the Network Service Manager. (Id. at Ex. 1 pg. 7; Pl.'s Memo in Opp'n to Def.'s Mot. for Sum. J. ("Pl.'s Memo."), Doc. No. 55 Ex. A).

Brocco, who is a white, became Network Service Manager in January 2000. (Id.). Brocco employed a strict management style where she gave employees "orders," left "little room for error" and saw each performance issue almost as "a personal attack" against her. (Id. at Ex. B, pg. 2-4). Plaintiff describes her as a "workplace bully." (Id. at Ex. R). During her first two years as manager she disciplined nine of her fifteen subordinates. (Id. at Ex. B, pg. 2-3). She also terminated two of them and another resigned. (Id. at pg. 3).

Brocco disciplined Plaintiff on numerous occasions. (Id. at pg. 2). He received a verbal warning in October 2001 because of problems with backing up data. (Def.'s Memo. Ex. 5). He received a written warning on July 10, 2002 because he allowed the servers to run out of disk space and did not monitor the event logs. (Id.). The warning stated that he would be reevaluated in thirty days. (Pl.'s Memo. Ex. G). On September 5, 2002, Plaintiff received his yearly performance review, which Brocco and Rodney Rockette ("Rockette"), her supervisor, signed. (Id. at Ex. R). Plaintiff earned an overall rating[3] of "Successful," but received a "Minimally Successful" rating in the "Response to Supervision" and "Communication" categories because he failed to finish projects on

---

[3]Defendant's rating scale has five levels. An "Exceptional" means that the employee exceeded the standard requirements of the job because his performance "approached the best that could be expected on a regular basis."(Pl.'s Memo. Ex. R pg. 2). "Highly Successful" means that the employee exceeded the standard requirements of the job because his performance was "better than average on a regular basis." (Id.). "Successful" means that "performance ... was consistently successful and the duties and responsibilities were regularly performed in a satisfactory manner." (Id.). "Minimally Successful" means that the employee was "adequate," and met the "minimum expectation," but rarely exceeded them. (Id.). "Unsatisfactory" means that the employee did not meet the minimum job requirements. (Id.).

2

time and follow Brocco's orders. (Id. at pg. 5-6). On October 9, 2002[4], Plaintiff received his reevaluation as required by the July 2002 warning. (Id. at Ex. G). It stated that he had "made the necessary improvements as discussed," was "demonstrating the quality, professional approach required of a Senior Network Manager," and was "back on the professional track." (Id.).

On October 14, 2002, Brocco emailed Plaintiff, informing him that "certain failures" had come to her attention and suggesting that they should schedule a meeting to avoid "restarting the disciplinary process."(Def.'s Memo. Ex. 8). On October 15, 2002, Plaintiff met with Rockette and requested time off under the Family Medical Leave Act ("FMLA") because excess stress at work was causing him problems with controlling his blood pressure. (Pl.'s Memo. Ex. L). He did not consult with Brocco before requesting leave. (Def.'s Memo. Ex. 4). He also emailed Pat Cooney ("Cooney"), the director of Human Resources, to discuss his frustration with "how things are handled" by Brocco.[5] (Pl.'s Memo. Ex. H).

When Plaintiff went on leave, Brocco restricted his access to the computer and voicemail[6] systems. His voicemail access, however, was restored after he complained about losing it. (Def.'s Statement of Uncontroverted Facts, Doc. No. 51 ¶ 7-13; Pl.'s Statement of Uncontroverted Facts, Doc. No. 55 ¶ 5, 7-10). Brocco employed this policy because she believed an employee has no need for access if he is too sick to come to work. (Def.'s Memo. Ex. 1). Brocco also testified that she

---

[4]The evaluation is dated October 4, 2002, but Brocco signed it on October 9, 2002. (Pl.'s Memo. Ex. G).

[5]After meeting with Plaintiff, Cooney asked Brocco to document all issues with him and stated that Human Resources would review any discipline before it was given to him. (Pl.'s Memo. Ex. O). This arrangement largely cut Rockette out of the loop. (Id.). Rockette is black and Cooney is white. (Id.).

[6]There is some disagreement about whether Brocco personally revoked his access; however, this is irrelevant. Neither party disputes that he actually lost access to the computer and voicemail systems because of Brocco's policy. (Def.'s Memo. Ex. 1).

3

revoked two white employees' access to the network when they went on leave. (Id.). In an email dated October 24, 2002, Brocco asked for clarification about whether Plaintiff would return to his previous position upon returning from FMLA leave. (Pl.'s Memo. Ex. N).

When Plaintiff returned to work on November 5, 2002, Brocco promptly placed him on probation for ninety days. She based this decision on his failure to communicate with her about leaving work, work assignments, and scheduled meetings. (Def.'s Memo. Ex. 8). She also based her decision on his failure to support the HRIS/Cyborg project, to move applications to a different server, to complete help desk tickets, to complete tasks in a timely manner, and to maintain agency backups. (Id.). He was removed from HRIS/Cyborg project and from maintaining agency backups. (Id.). Plaintiff alleges that Brocco put him on probation within thirty minutes of his return to work.[7] Brocco denies that she disciplined Plaintiff for taking FMLA leave and asserts that his leave merely postponed his probation.[8] (Id. at Ex. 1).

About this time, Plaintiff allegedly complained to Stanley Williams Jr.[9] ("Williams"), the workforce diversity specialist, about Brocco racially discriminating against him. Williams, however, denies that this conversation occurred. (Id. at Ex. 10). Williams did review the written discipline issued by Brocco and found she employed an overly harsh tone in her communications with

---

[7]Brocco testified that she "guess[ed]" it happened that quickly and then later stated that "I can't believe it would ha[ve] happened that quickly [after] h[e] walk[ed] in the door." (Def.'s Memo. Ex. 1 pg. 25-26).

[8]Plaintiff also asserts that a white employee, Brian Pugilsi, was treated differently upon returning from FMLA leave in Summer 2003. (Pl.'s Memo. Ex. A). Pugilisi requested that, upon his return, he would be assigned to a different manager and office. (Id.). Debra Erickson, Brocco's supervisor, decided to grant his requests. (Id.). Erickson justified her decision to undermine Brocco's authority because her management style was too "stubborn" and "we need[ed] to stop firing people." (Id.).

[9]Williams resigned in August 2003 to take a position with Charter Communications. (Def.'s Memo. Ex. 10 ¶ 4).

4

subordinates. (Pl.'s Memo. Ex. A). He suggested that she attend a management course to address this issue.[10] (Id.).

Plaintiff received a progress update on December 5, 2002, that noted improvement in nine of the twelve areas cited in his probation notice. (Id. at Ex. K). Brocco, however, noted that he failed to use proper help desk ticket procedures, failed to complete two help desk tickets, and would have missed a meeting had she not radioed him. (Id.). On March 25, 2003, he filed a FMLA claim with the Department of Labor ("DOL"), which declined to pursue the matter. (Id. at Ex. I, M). Neither Brocco nor Debra Erickson ("Erickson"), her supervisor since February 2003, knew of his DOL claim prior to his termination. (Def.'s Memo. at Ex. 1 pg. 14, Ex. 6 ¶ 11).

On August 19, 2003, Brocco sent Plaintiff a preliminary notice of termination, which Erickson reviewed. (Id. at Ex. 1). He was being terminated because his poor performance had put Defendant's network and data in "serious jeopardy, which [did] not allow another probationary period." (Id. at Ex. 5). Brocco listed numerous incidents to support her conclusion. On January 23, 2003, he improperly handled a help desk ticket. (Id.). On July 30, 2003, she discovered that a proxy server, which he was supposed to monitor, had been out of disk space for weeks. (Id.). During the week of August 4, 2003, he allowed the system to improperly overwrite weeks of backups. (Id.). On August 6, 2003, the payroll department was unable to recover a deleted file because he had not backed up the files. (Id.). On August 7, 2003, another server ran out of space even though they had recently discussed this problem. (Id.). Finally, on August 11, 2003, another server crashed and he tried to convince another employee to correct the problem so he could continue working on a low priority project. (Id.). A hearing regarding his termination was held on September 23, 2003, and Tina Votaw,

---

[10]She was scheduled to attend a management course in January 2003. (Pl.'s Memo at Ex. J). The evidence is unclear about whether she actually attended. (Def.'s Memo. at Ex. 6 ¶ 4).

5

Vice President of Economic Development, upheld the decision to terminate him on October 2, 2003. (Id. at Ex. 7).

Plaintiff filed his Third Amended Complaint on March 30, 2006 (Doc. No. 28). Plaintiff alleges[11] Defendant retaliated against him in violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2601, et seq, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. As previously stated, Defendant filed its Motion for Summary Judgment on December 13, 2006. (Doc. No. 50).

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at

---

[11]The Court previously dismissed his 42 U.S.C. § 1981 claim, his Title VII hostile work environment claim, and his claim under the Federal False Claims Act. (Court's Order of August 8, 2006, Doc. No. 38).

247. The nonmoving party may not rest upon mere allegations or denials of his pleading. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. Id. at 255. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Id. at 249.

## DISCUSSION

Plaintiff alleges Defendant retaliated against in him in violation of Title VII and FMLA. He asserts that his loss of phone and network privileges and his probation were in retaliation to his taking FMLA leave. (Pl.'s Memo. ¶ 1-20). He also alleges that his termination was in retaliation for making a claim of discrimination to Williams in November 2002 and for making a FMLA claim with the DOL in March 2003. (Pl.'s Memo.¶ 22-34, 41-60). Defendant asserts that Plaintiff cannot make out a prima facie case for retaliation and that legitimate, non-discriminatory reasons for its actions exist.

### Title VII Retaliation

Title VII prohibits employers from discriminating against an employee who "has opposed any practice made an unlawful employment practice by this subchapter" or who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Because Plaintiff has no direct evidence of retaliation, his claim is analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Twymon v. Wells Fargo & Co., 462 F.3d 925, 936 (8th Cir. 2006). Under this framework, Plaintiff has the initial burden of establishing a prima facie case of retaliation. Clark v. Johanns, 460 F.3d 1064, 1067 (8th Cir. 2006). Once Plaintiff satisfies this burden, Defendant must offer a legitimate, non-discriminatory reason for the employment action. Quick v. Wal-Mart Stores,

Inc., 441 F.3d 606, 610 (8th Cir. 2006). The burden of production then returns to Plaintiff to show that the employer's reason was a pretext for discrimination. Id.

To establish a prima facie case of retaliation, Plaintiff must present evidence that 1) he engaged in a protected activity; 2) an adverse employment action was taken against him; and 3) a causal connection exists between the two. Thompson v. Bi-State Dev. Agency, 463 F.3d 821, 826 (8th Cir. 2006). The threshold of proof to establish a prima facie case is "minimal." Logan v. Liberty Healthcare Corp., 416 F.3d 877, 881 (8th Cir. 2005)(citing Young v. Warner-Jenkinson Co., 152 F.3d 1018, 1022 (8th Cir. 1998)).

The Court assumes, without deciding, that Plaintiff actually complained of racial discrimination to Williams in November 2002 and finds that complaining to management about racial discrimination is protected activity. Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 914 (8th Cir. 2006). There is no dispute that termination is an adverse employment action. Kasper v. Federated Mut. Ins. Co., 425 F.3d 496, 502 (8th Cir. 2005); Cheshewalla v. Rand & Son Constr. Co., 415 F.3d 847, 851 (8th Cir. 2005).

To prove causation, a plaintiff must show that an employer's retaliatory motive played a part in the adverse employment action. Hughes v. Stottlemyre, 454 F.3d 791, 797 (8th Cir. 2006). Evidence that gives rise to an inference of retaliatory motive is sufficient to prove a causal connection. Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002). Evidence of temporal connection alone is usually not enough. Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc); see Smith v. Allen Health Sys., Inc. 302 F.3d 827, 833 (8th Cir. 2002)(holding a two week interval between protected activity and adverse employment action was "sufficient, but barely so" to show a causal connection). Additionally, evidence showing that the decision maker was unaware of the protected activity at the time of the adverse employment action negates any possible

8

causal connection. See Robinson v. Potter, 453 F.3d 990, 994 (8th Cir. 2006). Finally, a plaintiff cannot rely, without more, on evidence that he and his employer had a contentious relationship. Henderson v. Ford Motor Co., 403 F.3d 1026, 1037 (8th Cir. 2005). Plaintiff asserts that a causal connection exists between his complaint to Williams and his termination, which occurred ten months later. He also asserts that the suggestion to Brocco that she attend management training prompted her to terminate him, and the one week period between Williams' resignation and his termination, also shows a casual connection.(Pl.'s Memo. pg. 8-10).

These reasons do not demonstrate a causal connection. The Eighth Circuit has held that an eleven month interval between a protected activity and an adverse employment action, without more, is not enough to establish a causal connection. Lewis v. St. Cloud State Univ., 467 F.3d 1133, 1138 (8th Cir. 2006)(citing Kipp, 280 F.3d at 897(holding no causal connection when two months elapsed between protected activity and adverse employment action)). Thus, the nine month interval between his alleged complaint to Williams and his termination does not establish a causal connection. Similarly, Brocco's apparent attendance at management training sometime in early 2003[12] does not establish a causal connection. The time lapse between this event and his termination, without more, does not establish a causal connection. Sowell v. Alumnia Ceramics, Inc., 251 F.3d 678, 685 (8th Cir. 2001)(seven month lapse too long, without more, to establish a causal connection); Kipp, 280 F.3d at 897. Nothing in the record suggests a causal connection between Williams' resignation and Plaintiff's termination. Finally, neither Brocco nor Erickson, who signed off on the preliminary decision to terminate him, knew of his racial discrimination claim when making their decisions. See

---

[12]The evidence suggests that she may have attended sometime in early 2003.(Def.'s Memo. Ex. 6 ¶ 4).

9

Robinson, 453 F.3d 990 at 994. Defendant's Motion for Summary Judgment regarding Plaintiff's Title VII claim will be granted.

### FMLA Retaliation

Plaintiff claims that Defendant retaliated against him by taking away his network and phone privileges, by placing him on probation the day he returned to work, and by terminating him for making a FMLA claim with the DOL. Defendant argues that Plaintiff cannot make out a prima facie claim and that it had legitimate, non-discriminatory reasons for its actions.

Like his Title VII claim, Plaintiff presents no direct evidence of retaliation. Thus, his FMLA retaliation claim is analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green. To prove a prima facie case of FMLA retaliation, Plaintiff must show 1) he exercised his rights afford by FMLA; 2) he suffered an adverse employment action; and 3) there was a causal connection between his exercise of rights and the adverse employment action. McBurney v. Stew Hansen's Dodge City, Inc., 398 F.3d 998, 1002 (8th Cir. 2005). Neither party contends that requesting FMLA leave and filing a complaint with the Department of Labor are not protected activities.

The Supreme Court has recently clarified the meaning of adverse employment action. Burlington N. & Sante Fe Ry. Co. v. White, --- U.S. ---, 126 S. Ct. 2405, 165 L. Ed 2d 345 (2006). The Supreme Court adopted the Seventh and District of Columbia Circuits' standard that a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415. (internal quotations and citations omitted). It also affirmed a jury's verdict that found reassignment of duties was an adverse employment action where the previous job had more prestige, was considered better, and was less arduous. Id. at 2416.

Termination is clearly an adverse employment action. Similarly, probation, which may be a first step towards termination, is an adverse employment action because a reasonable employee may be dissuaded by the threat of diminished responsibilities and increased supervision. See Velikonja v. Gonzales, 466 F.3d 122, 124 (D.C. Cir. 2006)[13](holding investigation of employee was an adverse employment action due to negative stigma it created); See Kim v. Nash Finch Co., 123 F.3d 1046, 1060 (8th Cir. 1997). A factfinder could conclude that losing access the phone and computer network might dissuade a reasonable employee from taking FMLA leave. See Wrobel v. County of Erie, No. 06-1295-CV, 2007 WL 186264 at *1 (2d Cir. Jan. 19, 2007)(monitoring employee's phone call could constitute an adverse employment action).

Plaintiff, however, must still demonstrate a causal connection. The Court finds he cannot demonstrate one between his termination and his DOL complaint. Brocco and Erickson, the decision makers, were unaware of his DOL complaint. See Robinson, 453 F.3d 990 at 994. His termination took place almost five months after he contacted the DOL. See Kipp, 280 F.3d at 897. Plaintiff, however, can show a causal connection between his loss of phone and computer network privileges because they were restricted while he was on leave. Additionally, Plaintiff can demonstrate a causal connection between his probation and his FMLA leave because he was placed on probation the day he returned from leave. Although temporal evidence alone does not usually support a finding of causal connection, it can in cases where little time elapses. See Smith, 302 F.3d at 833.

---

[13]The standard adopted in White abrogates the "ultimate employment decision" standard previously employed by the Fifth and Eighth Circuits. See White, 126 S. Ct. at 2410-11 (rejecting the Eighth Circuit's approach, as espoused in Manning v. Metro. Life Ins. Co., 127 F.3d 686, 692 (8th Cir. 1997)). The Court cannot find any Eighth Circuit decisions applying the new standard; therefore, the Court will look, if needed, to post-White precedent from other circuits to determine whether Plaintiffs suffered an adverse employment action.

11

Defendant has offered a legitimate, non-discriminatory reason for placing Plaintiff on probation: he performed his job poorly. It has also offered a legitimate, non-discriminatory reason for restricting Plaintiff's network access: Brocco's policy was that a sick employee has no reason to access his work while on leave. Thus, the burden shifts back to Plaintiff to show that this reason was a pretext for retaliating against him. To show pretext, a plaintiff must both discredit the employer's asserted reason and show that the circumstances permit drawing the reasonable inference that the real reason for probation was based on his FMLA leave. Johnson v. AT & T Corp., 422 F.3d 756, 763 (8th Cir. 2005). Making a showing of pretext requires "more substantial evidence than it takes to make out a prima facie case ... because, unlike evidence establishing a prima facie case, evidence of pretext and [retaliation] are viewed in light of the employer's justification." Erickson v. Farmland Indus., Inc., 271 F.3d 718, 726 (8th Cir. 2001). To carry this burden, the employee must show that the proffered reason was "unworthy of credence." Wallace v. Sparks Health Sys., 415 F.3d 853, 860 (8th Cir. 2005)(quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)). An employee can demonstrate pretext by showing the employer's proffered reason has no basis in fact. Smith, 302 F.3d at 834-35. Evidence of recent favorable reviews are often used as evidence that the employer's proffered reason has no basis in fact. Turner v. Gonzales, 421 F.3d 688, 698 (8th Cir. 2005).

Upon consideration, the Court finds that Plaintiff cannot show that Brocco's reason for suspending his phone and network access was a pretext for discrimination. Plaintiff has offered no evidence to show that Brocco was doing anything other than applying her legitimate, albeit strict, work policy. A genuine issue of material fact exists regarding whether Plaintiff's probation was a pretext for retaliation. The evidence, when viewed in the light most favorable to Plaintiff, shows that one of Brocco's reasons for punishing him was that he missed a meeting with her because he was

meeting with Rockette to request FMLA leave. (Pl.'s Memo. Ex. C). Additionally, Brocco gave him a favorable performance evaluation only a few days[14] before finding six performance issues severe enough that they required placing him on probation for ninety days. (Id. at Ex. K). The timing of the probation, when viewed in the context of the other evidence, supports the Court's conclusion. Coffman v. Tracker Marine, L.P., 141 F.3d 1241, 1246 (8th Cir. 1998). Thus, Defendant's Motion for Summary Judgment, as it relates to the claim that Plaintiff's probation was retaliatory, will be denied.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 50) is **GRANTED** in part and **DENIED** in part.

Dated this 22nd day of February, 2007.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE

---

[14]Plaintiff was only at work for roughly one week between his review and his probation.